# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARIA ADELAIDE QUEIROGA,
      Plaintiff,

      v.

NANCY A. BERRYHILL,[1] Acting
Commissioner of Social Security,
      Defendant.

No. 3:16-cv-00016 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In the instant Social Security appeal, Maria Adelaide Queiroga moves to reverse the

decision by the Social Security Administration (SSA) denying her disability insurance benefits.

The Commissioner of Social Security moves to affirm the decision. Because the decision by the

Administrative Law Judge (ALJ) was supported by substantial evidence, I grant the

Commissioner's motion and deny Queiroga's.

## I.    Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does have a severe

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill has been automatically substituted as defendant for Carolyn W. Colvin, because Carolyn W. Colvin has ceased to hold the office of Acting Commissioner of Social Security.

impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*,

722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Facts

Maria Adelaide Queiroga applied for Social Security disability insurance benefits on July 26, 2012, alleging that she had been disabled since March 1, 2011. ALJ Decision, R. at 18. Queiroga identified her disabilities as "[n]eck and spine issues" and "vertigo." *See* Disability Determination Explanation (Initial), R. at 98. Because Queiroga "last met the insured status requirements of the Social Security Act on December 31, 2011," ALJ Decision, R. at 21, she may receive disability benefits now only if she suffers from a "continuous disability" that "began before th[e] date" on which her "'insured status' lapsed." *See Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989). "[R]egardless of the seriousness of [her] present disability, unless [Queiroga] became disabled before [December 31, 2011], [s]he cannot be entitled to benefits." *Id.*

The SSA initially denied Queiroga's claim on September 12, 2012, finding that although Queiroga's "condition resulted in some limitations in [her] ability to perform work related activities, . . . [her] condition was not disabling on any date through [December 31], 2011 when

[she] w[as] last insured for disability benefits."[2] Disability Determination Explanation (Initial), R. at 106. The SSA adhered to its decision upon reconsideration on December 13, 2012.[3] Disability Determination Explanation (Reconsideration), R. at 117. Queiroga then requested a hearing before an ALJ. An initial hearing was held on July 24, 2013, and a supplemental hearing (with a vocational examiner newly present) was held on January 23, 2014. Tr. of ALJ Hr'g (July 24, 2013), R. at 65; *id.* (Jan. 23, 2014), R. at 35. Both hearings were conducted with the assistance of a Portuguese interpreter. *See id.* at 35, 65.

At the first hearing, ALJ Matthew Kuperstein questioned Queiroga and her attorney about her ability to communicate in English,[4] Tr. of ALJ Hr'g, R (July 24, 2013), and her claim

---

[2] The SSA consultant, Abraham Bernstein, MD, deemed Queiroga's statements regarding her symptoms only "[p]artially [c]redible" because the "[a]lleged limitations [were] not fully supported by [medical evidence of record]." Disability Determination Explanation (Initial), R. at 120. He concluded that Queiroga's "[p]ositional ver[t]igo affect[ed] her balance," such that she "must avoid heights . . . [and] avoid moving machinery," but that she could perform past relevant work as a cleaner or housekeeper. *Id.* at 103–04.

[3] Jeffrey Wheeler, MD—the SSA consultant at the reconsideration level—agreed with Dr. Bernstein that Queiroga was only "[p]artially [c]redible" because her "[a]lleged lim[i]tations [were] not fully supported by [medical evidence of record]." Disability Determination Explanation (Reconsideration), R. at 112. He also observed that Queiroga's "[t]reating surgeon," Dr. Girasole, "remark[ed] on [her having] disproportionate symptoms" on May 14, 2012. *Id.*

[4] The ALJ stated that he "really d[id]n't see any development in the record showing that [Queiroga] [was] unable to communicate in English." Tr. of ALJ Hr'g (July 24, 2013), R. at 73. In response to Queiroga's statement that her daughter accompanied her to her doctor's appointments in order to translate, the ALJ noted that he "d[id]n't see any notations about [her] daughter . . . or anyone else joining [her] for [her] appointments." *Id.* at 79. In fact, several of Queiroga's doctors mentioned that her daughter or sister accompanied her to at least some of her appointments. *See, e.g.*, Letter from K.N. Sena, MD (Mar. 8, 2011), R. at 396–97; Progress Note by Abraham Mintz, MD (Dec. 10, 2011), R. at 406–07; Progress Note by Gerald Girasole, MD (Feb. 6, 2012), R. at 428  ("She is translated by her daughter, she speaks Portuguese . . . ."); *id.* (Apr. 2, 2012), R. at 431 ("This was discussed with her daughter because the patient speaks predominantly only Portuguese.").

Unfortunately, the extent to which the ALJ returned to the topic suggests that he may have placed excessive weight on Queiroga's alleged language skills in assessing her credibility.

4

that her vertigo caused her to "lose [her] balance" and "immediately fall down." *Id.* at 90. The ALJ suggested to Queiroga and her attorney that she consider seeking "a closed period" of disability benefits—i.e., one that would terminate when her condition improved—because he "d[id]n't see much from the treatment regarding the difficulty working . . . since . . . [her] surgery." *Id.* at 93–94; *see id.* at 94 ("I know she's complaining of . . . some neck pain, ongoing neck pain, but it doesn't seem that significant from what I'm seeing from the doctor's notes . . . ."). After consultation with her attorney, Queiroga declined to seek a closed period. *Id.* at 95.

At the supplemental hearing, the ALJ asked Queiroga more about the nature of her past work Tr. of ALJ Hr'g (Jan. 23, 2014), R. at 39–42, and about whether her condition had deteriorated since the previous hearing. *Id.* at 43–44. Queiroga made additional complaints about her hearing and pain in her ear and neck. *Id.* at 44–45. She also stated that, due to her vertigo, she "g[o]t dizzy and . . . ha[d] to vomit" when she "ha[d] [her] head down." *Id.* at 49.

The ALJ then called a vocational expert, Edmond Calandra. The ALJ asked Calandra to "assume a hypothetical individual with the past jobs" held by Queiroga. *Id.* at 53. He asked him "[f]urther [to] assume that th[e] individual [was] limited to . . . light exertion work with no pushing or pulling with [her] right arm . . . for the operation of hand controls." *Id.* at 53–54. "[T]he individual could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch,

---

*See, e.g.*, Tr. of ALJ Hr'g (July 24, 2013), R. at 81 ("I don't have any evidence in the record reflecting that any of her supervisors . . . communicated in Portuguese."); *id.* at 82 ("Q: . . . [Y]ou don't know Spanish, do you? A: I understand a little bit. Q: Okay. I asked you earlier if you knew any languages, you told me you only knew Portuguese."); *id.* ("I have nothing in the record to show that all her work . . . was done without English."); *id.* at 83 ("[O]nce again, Counsel, I don't have anything in the record reflecting the work history . . . being without English directions."). Any error in that regard was harmless, however, because the ALJ did not rely on Queiroga's language abilities in his written opinion, and Queiroga's relative fluency in English appears to have "had no effect on the ALJ's decision." *See Wettlaufer v. Colvin*, __ F. Supp. 3d __, 2016 WL 4491759, at *13 (W.D.N.Y. 2016).

or crawl," and "would further be limited to no climbing of ladders, ropes, or scaffolds." *Id.* at 54. Finally, "[t]he individual would have [] further limitation[s] to . . . only occasional reaching with the right upper extremity, and no overhead reaching with the . . . right extremity," and "needing to avoid concentrated exposure to moving machinery . . . or heights." *Id.* Calandra opined that such a hypothetical person would not be able to perform any of Queiroga's past work, but could perform other work such as "small parts assembler, . . . [s]olderer, . . . [a]nd hand sewer." *Id.*

The ALJ also asked Calandra to consider a hypothetical individual who "was further limited . . . to only frequent fingering or feeling." *Id.* at 55. Calandra reported that the additional limitation would "eliminate all three" positions he had mentioned, and that "considering someone who has no[] English speaking skills . . . and no reading skills, . . . there really would be no jobs for th[at] person." *Id.* If the hypothetical person "w[ere] able to read addresses," however, Calandra opined that she "could be a mail clerk, . . . ticket taker, . . . [or] jewelry painter." *Id.* at 56. Were the person "limited to only occasional fingering or feeling . . . with both hands," Calandra stated that would "eliminate all of th[ose] [jobs]," and that there would be no other work available for the hypothetical person. *See id.* at 57.

Queiroga's counsel then examined the vocational expert. He asked Calandra to consider a hypothetical person with the restrictions already provided by the ALJ, who also "could not have [her] head positioned downward." *Id.* Calandra stated that such an additional limitation "would eliminate all" the jobs he had previously listed, and that "there would be no work" for such a person in the national economy. *See id.* at 57–58. The ALJ asked Queiroga's attorney where in the record "there [was] any discussion of her problem keeping her head down," to which counsel responded that her doctors reported her saying that "she c[ould] not bend without having an

episode of vertigo" and that her "symptoms worsened by bending [her] neck forwards, backwards, and sideways." *Id.* at 60.

After the second hearing, on February 28, 2014, the ALJ issued an opinion in which he found that Queiroga "was not under a disability, as defined in the Social Security Act, at any time from March 1, 2011, the alleged onset date, through December 31, 2011, the date last insured." ALJ Decision, R. at 27. At the first step, the ALJ found that Queiroga "did not engage in substantial gainful activity during the period from her alleged onset date . . . through her date last insured." *Id.* at 21. At the second step, the ALJ found that Queiroga's "degenerative disc disease of the cervical spine and vertigo" were "severe impairments" that existed "[t]hrough the date last insured." [5] *Id.* At the third step, the ALJ determined that Queiroga's impairments were not per se disabling because "[t]he severity of [Queiroga]'s cervical impairment did not satisfy the criteria of Listing 1.04. [6] *Id.* at 22.

The ALJ then assessed Queiroga's residual functional capacity, and found that she could "perform light work . . . except that she c[ould] not perform pushing or pulling with her right arm for the operation of hand controls, . . . c[ould] only occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl," and was "further limited to no climbing of ladders, ropes or scaffolds and . . . only occasional reaching with the right upper extremity and no overhead

---

[5] The ALJ ruled that Queiroga's "bilateral hearing loss" and "hand numbness" were not "severe impairment[s]" because the former had "improved after . . . surgery" during the relevant period, and the latter was "not supported by medical evidence." *See* ALJ Decision, R. at 21–22. As Queiroga's memorandum focuses entirely on vertigo, she does not appear to challenge those other rulings. *See* Pl.'s Mem. Supp. Mot. Reverse, Doc. No. 17-1, at 9–12.

[6] Queiroga also does not appear to challenge the ALJ's determination that "[t]he severity of [her] cervical impairment did not satisfy the criteria of Listing 1.04." *See* ALJ Decision, R. at 22.

reaching with the right upper extremity." *Id.* at 23. Finally, Queiroga "would need to avoid concentrated exposure to moving machinery or heights." *Id.*

Although Queiroga's residual functional capacity rendered her "unable to perform any past relevant work," ALJ Kuperstein determined that "[t]hrough the date[] last insured, . . . there were jobs that existed in significant numbers in the national economy that [Queiroga] could have performed." *Id.* at 25–26. "Based on the testimony of the vocational expert," the ALJ ruled that "through the date last insured, . . . [Queiroga] was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." *Id.* at 27. "A finding of 'not disabled' [was] therefore appropriate," and the ALJ denied Queiroga's request for disability insurance benefits. *Id.*

Queiroga requested a review of the ALJ's decision by the SSA's Appeals Council on April 29, 2014. Request for Review of Hearing Decision/Order, R. at 7. Finding that there was "no reason . . . to review the [ALJ]'s decision," the Appeals Counsel "denied [Queiroga's] request for review" on November 6, 2015. Notice of Appeals Council Action, R. at 1. Queiroga then filed a complaint before this court urging me to reverse the Commissioner's decision on January 6, 2016. Compl., Doc. No. 1.

## III.   Discussion

On appeal, Queiroga asserts that "the findings and conclusions of the [ALJ] are not supported by substantial evidence." Pl.'s Mot. Reverse, Doc. No. 17, at 1. Specifically, she contends that ALJ Kuperstein "ignor[ed] the consistent and longitudinal evidence that [Queiroga] suffered from significant vertigo that according to her treating physician and the vocational expert precluded her from work." Pl.'s Mem. Supp. Mot. Reverse, Doc. No. 17-1, at 9–10. The Commissioner responds that the ALJ "adequately accommodated [Queiroga]'s

vertigo" by issuing a "residual functional capacity limitation from concentrated exposure to moving machinery and heights." Comm'r's Mem. Supp. Mot. Affirm, Doc. No. 19-1, at 12. She also argues that much of Queiroga's evidence of her impairment stems from "records that post-date her date last insured," and that her "claim that her vertigo rendered her disabled during the relevant period is inconsistent with evidence of her daily activities." *Id.* at 13–14.

At the outset, Queiroga asserts that the ALJ improperly discounted her treating physicians' "opin[ion] that [her] vertigo precluded her from working." *See* Pl.'s Mem. Supp. Mot. Reverse, Doc. No. 19-1, at 13. "The treating physician rule provides that an ALJ should defer to 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record."[7] *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting 20 C.F.R. § 404.1527(c)(2)). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418. After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), and provide "good reasons" for the weight assigned.

---

[7] Originally a rule devised by the federal courts, the treating physician rule is now codified by SSA regulations, but "the regulations accord less deference to unsupported treating physician's opinions than d[id] [the Second Circuit's] decisions." *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

*Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). But "where the ALJ's reasoning and adherence to the regulation are clear," the ALJ need not "slavish[ly] recite[] each and every factor" listed. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order). Furthermore, "[g]enuine conflicts in the medical evidence are for the Commissioner"—not the court—"to resolve." *Burgess*, 537 F.3d at 128.

In the present case, I conclude that the ALJ properly weighed the opinions from Queiroga's treating physicians. First, as the Commissioner notes, "whether an individual is able to work is an issue reserved to the Commissioner," and "[a] treating physician's statement that a claimant is disabled cannot itself be determinative." *See* Comm'r's Mem. Supp. Mot. Affirm, Doc. No. 19-1, at 14 (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).

Second, Queiroga had a number of treating physicians, not all of whom thought that her condition prevented her from working. Queiroga's primary care physician, Dr. Nascimento, wrote in August 2012 that her "chronic neck pain, back pain, shoulder pain, and vertigo . . . affected her ability to work." *See* Letter from Joao Nascimento, MD to Conn. Disability Determination Servs. (Aug. 6, 2012), R. at 359. Conversely, Queiroga's radiologist, Dr. Meszaros, concluded in February 2011 that an MRI of her brain showed "no obvious abnormality of the brain parenchyma," even as he recorded Queiroga complaining of "[n]ew onset of headache and dizziness." *See* Progress Note by Michael Meszaros, MD (Feb. 1, 2011), R. at 390. Queiroga's neurologist, Dr. Sena, reported in March 2011 that although Queiroga's "Hallpike maneuver [was] positive with vertigo and nyastagmus," her "postural vertiginous sensation" was—contrary to Queiroga's hearing testimony, *see* Tr. of ALJ Hr'g (Jan. 23, 2014), R. at 49—"not associated with any nausea or vomiting." *See* Letter from K.N. Sena, MD to Joao Nascimento, MD (Mar. 8, 2011), R. at 397. And after Queiroga had surgery to correct cervical

disc herniations in February 2012, her neurosurgeon, Dr. Mintz, recorded her complaints of "significant vertigo" but nevertheless observed that "her condition ha[d] significantly improved."[8] Progress Note by Abraham Mintz, MD (Apr. 20, 2012), R. at 420. Such conflicting views on the part of Queiroga's physicians presented "[g]enuine conflicts in the medical evidence . . . for the Commissioner to resolve," and the ALJ was entitled to "choose between properly submitted medical opinions" in placing greater weight on the less restrictive findings. *See Burgess*, 537 F.3d at 128; *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

Third, the ALJ appropriately declined to place great weight on the opinion most favorable to Queiroga, that of her otolaryngologist, Dr. Kveton. Dr. Kveton wrote to Queiroga's lawyer in August 2013 that "[a]t this point, it appears that Ms. Queiroga's dizziness and positional vertigo preclude her from working because of its severity." Letter from John F. Kveton, MD to John Serrano (Aug. 27, 2013), R. at 633. But Kveton's statement suggests, at most, that Queiroga was unable to work "*[a]t this point*"—i.e., in the summer of 2013, well after the relevant period. *See id.* (emphasis added); Comm'r's Mem. Supp. Mot. Affirm, Doc. No. 19-1, at 13–14. During the relevant period, moreover, "there was a significant gap in treatment" with Dr. Kveton "from July 2011 until June 2012," and when Queiroga did "return to him for treatment [in] June 2012, . . . she reported problems with ear draining and alleged no dizziness." *See* ALJ Decision, R. at 25. Finally, Dr. Kveton's suggestion that "the problem [was] related to [Queiroga's] central nervous

---

[8] Many of Queiroga's medical records describe complaints about her disc herniations, rather than vertigo. The pain caused by those herniations "dramatically improved" after Queiroga's surgery. *See* Progress Note by Abraham Mintz, MD (Mar. 12, 2012), R. at 419. When Queiroga reported additional pain to her orthopedist in May 2012, he recorded that he thought her "pain . . . was out of proportion," that she "continue[d] to complain . . . [that] she c[ould] not work," and that he "[was] not sure why she [was] having th[at] pain." Progress Note by Gerald Girasole, MD (May 14, 2012), R. at 447.

system" ventured outside his area of specialization, and conflicted both with the opinion of her neurologist and with the apparently normal MRI of her brain. *See* Letter from John F. Kveton, MD, to John Serrano (Aug. 27, 2013), R. at 633. Those deficiencies provided sufficient cause for the ALJ "not [to] give the treating source's opinion controlling weight." *See Selian*, 708 F.3d at 418 (factors include "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist").

Beyond discounting her physicians' opinions, Queiroga also alleges that the ALJ "d[id] not adequately address [her] vertigo," which I interpret to be an attack on the residual functional capacity finding. Between steps three and four of the SSA's analysis for disability claims, the ALJ must "determine[], based on all the relevant medical and other evidence of record, the claimant's 'residual functional capacity,' which is what the claimant can still do despite the limitations imposed by his impairment." *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. § 404.1520(b)). The ALJ's determination need not "perfectly correspond with" any medical opinion. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). Rather, the ALJ is "entitled to weigh all of the evidence available" to make a "finding that [is] consistent with the record as a whole." *Id.* In assessing residual functional capacity, SSA regulations require the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," as well as "discuss[ing] the [claimant]'s ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describ[ing] the maximum amount of each work-related activity the [claimant] can perform based on the evidence available in the case record." SSR 96-8p, 1996 WL 374184, at *7. The ALJ "must also

explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* The ALJ is not, however, "required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* "Credibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are patently unreasonable." *Pietrunti v. Dir., Off. of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted).

SSA regulations provide a two-step process for evaluating a claimant's subjective assertions of pain and other limitations. *Genier*, 606 F.3d at 49. First, the ALJ must decide "whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). Second, if the claimant does suffer from such an impairment, the ALJ must consider "the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record," taking into account (i) statements the claimant or others make about her impairments, (ii) her restrictions, (iii) her daily activities, (iv) her efforts to work, and (v) any other relevant statements she makes either to "medical sources during the course of examination or treatment," or to the SSA "during interviews, on applications, in letters, and in testimony in [] administrative proceedings." *Id.* (quoting 20 C.F.R. § 404.1512(b)(1)(iii)) (internal alterations and quotation marks omitted). Ultimately, "[a]s a fact-finder, the ALJ has the discretion to evaluate [] credibility." *Pietrunti*, 119 F.3d at 1042 (internal quotation marks omitted). "It is the function of the [ALJ], not the reviewing courts, . . . to appraise the credibility of witnesses, including the claimant." *Aponte*, 728 F.2d at 591 (internal alterations omitted).

In the present case, ALJ Kuperstein concluded that Queiroga's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely credible." *See* ALJ Decision, R. at 24. The ALJ reasoned that Queiroga's "described daily activities . . . were not as limited to the extent that one would expect given the complaints of disabling symptoms and limitations during the period at issue." *See* ALJ Decision, R. at 24. At the time, Queiroga reported that she was "independent in personal care, . . . prepared simple meals, drove her children to school, went shopping, watched television, and handled her finances." *See id.* at 24. Her medical record reflected only occasional complaints of vertigo, and gave "no support," in the ALJ's view, to Queiroga's claim that she "could not bend without having an episode of vertigo." *See id.* at 25. Because Queiroga "was noted as having vertigo during th[e] period," however, the ALJ did include "limitations for hazards . . . in the residual functional capacity," such as that Queiroga "would need to avoid concentrated exposure to moving machinery or heights."[9] *See id.* at 23, 25.

The ALJ also emphasized that his residual functional capacity finding was supported by the opinions of "the non-examining State agency medical consultants," as well as the hearing testimony of the vocational expert.[10] *See id.*; *Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir.

---

[9] Notably, Queiroga "does not raise any specific challenges to the [residual functional capacity], other than . . . that her vertigo was not adequately accommodated." *See* Comm'r's Mem. Supp. Mot. Affirm, Doc. No. 19-1, at 14. The Commissioner plausibly asserts that the ALJ's "limitation to no concentrated exposure to machinery or heights" should have "sufficiently accommodated [Queiroga's] condition." *See id.*

[10] Queiroga repeatedly argues that the vocational expert "opin[ed] that [she] would be unemployable" and that the ALJ improperly "fail[ed] to address the vocational expert's opinion." *See* Pl.'s Mem. Supp. Mot. Reverse, Doc. No. 17-1, at 11, 13. Not so: in response to the ALJ's hypothetical, the vocational expert opined that Queiroga could work as a "mail clerk, . . . ticket

2016) (summary order) ("[T]he opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence."). Furthermore, "[n]one of [Queiroga]'s treating or examining sources placed any physical limitations on her [that] were greater than the ones contained within the residual functional capacity assessment." ALJ Decision, R. at 25.

"Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings." *Snell*, 177 F.3d at 134. Because the ALJ "may exercise discretion in weighing the credibility of the claimant's testimony," where the decision "to discredit . . . subjective complaints is supported by substantial evidence, [the court] must defer to [the ALJ's] findings." [11] *Genier*, 606 F.3d at 49; *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order). Here, the ALJ's justifications for discounting Queiroga's credibility were not

---

taker, . . . [or] jewelry painter." *See* Tr. of ALJ Hr'g (Jan. 23, 2014), R. at 56–57. Only after Queiroga's attorney added on cross-examination that the hypothetical person "could not have his or [her] head positioned downward" did the vocational expert state that "there would be no work." *See id.* at 57–58. As the Commissioner aptly observes, however, Queiroga's "extreme [additional] limitation was not supported by the medical evidence" and "was not part of the [ALJ's] residual functional capacity determination." *See* Comm'r's Mem. Supp. Mot. Affirm, Doc. No. 19-1, at 15; ALJ Decision, R. at 25 ("g[iving] little weight to the . . . statement that [Queiroga] could not bend without having an episode of vertigo, [because] the treatment records d[id] not support th[at] limitation during the period at issue"). "[T]he ALJ properly declined to include in his hypothetical question symptoms and limitations that he had reasonably rejected," and an opinion based on those discredited symptoms does not provide grounds to reverse the decision. *See Priel v. Astrue*, 453 F. App'x 84, 87–88 (2d Cir. 2011) (summary order).

[11] Needless to say, there is no inconsistency in the ALJ declining to credit some portions of Queiroga's testimony and relying on others. As the finder of fact, the ALJ "may credit or discredit all or part of whatever testimony [he] hears in arriving at [his judgment]." *See Korte v. N.Y., N.H. & Hartford R. Co.*, 191 F.2d 86, 88 (2d Cir. 1951); *see also Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 467 (1968) ("[T]he Deputy Commissioner's finding was supported by substantial evidence" because although "some of the testimony . . . was arguably inconsistent with other parts . . . , it was within the province of the Deputy Commissioner to credit part of the witness' testimony without accepting it all.").

"patently unreasonable" and sufficed to meet the "very deferential" standard of substantial evidence. *See Pietrunti*, 119 F.3d at 104; *Brault*, 683 F.3d at 447–48. Because "substantial evidence" otherwise "support[s] the [residual functional capacity] determination," I affirm the ALJ's finding. *See Selian*, 708 F.3d at 417.

Finally, Queiroga contends that the ALJ erred by "limit[ing] his focus primarily to the medical records between [Queiroga]'s alleged onset date of March 1, 2011, and her date last insured of December 31, 2011." *See* Pl.'s Mem. Supp. Mot. Reverse, Doc. No. 17-1, at 9. To be sure, "the dearth of contemporaneous evidence [does not] *necessarily* preclude[] [Queiroga]'s entitlement to a 'period of disability.'" *See Arnone*, 882 F.2d at 39. "[E]vidence from earlier years could demonstrate that [Queiroga's] condition would not improve," or Queiroga might have relied on later evidence to show that she "had been continuously disabled since" an earlier date on which she had been insured. *See id.* Nevertheless, "[t]he initial burden of establishing the claimed disability was on [Queiroga]," and even if she theoretically "might have satisfied h[er] burden of demonstrating that [s]he was continuously disabled . . . by means of evidence" outside the relevant period, the ALJ reasonably "found that the evidence [she] did present failed to establish such a continuous disability." *See id.*

As explained above, ALJ Kuperstein made a residual functional capacity finding that would have allowed Queiroga to perform light work with restrictions during "the period from March 1, 2011 through the date last insured of December 31, 2011." *See* ALJ Decision, R. at 24. The ALJ also cited evidence outside the insured period, however, and in doing so, he made adequate findings to indicate that Queiroga "failed to establish . . . a continuous disability." *See id.*; *Mongeur*, 722 F.2d at 1040 ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony

16

presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."). For instance, the ALJ noted "there was a significant gap in treatment" for Queiroga's vertigo surrounding her date last insured, and that her "treatment records . . . d[id] not contain a discussion of problems with repeated falls," about which Queiroga complained at the hearing.[12] *See* ALJ Decision, R. at 25; Tr. of ALJ Hr'g (July 24, 2013), R. at 90 ("Sometimes I feel very dizzy and I fear to fall down on the floor. . . . I have told the doctor several times that I fall because of the dizziness."). So too, Queiroga's orthopedist, Dr. Girasole, recorded in February 2012 that Queiroga was "otherwise in [a] good state of health" and "ha[d] no other medical problems" besides "neck pain" that was treated through surgery for herniated discs. Progress Note by Gerald Girasole, MD (Feb. 6, 2012), R. at 428. Even when Queiroga first returned to her otolaryngologist, Dr. Kveton, in June 2012, "she reported problems with ear draining and alleged no dizziness." *See* ALJ Decision, R. at 25; Notes for Established Patient Visit (June 22, 2012), R. at 546 (noting "no dizziness").

Other evidence in the record was more favorable to Queiroga, and "if [I] were deciding th[e] case in the first instance," it might be reasonable to conclude that Queiroga's impairments were more disabling than the ALJ allowed. *See Campbell v. Astrue*, 596 F. Supp. 2d 446, 455 (D. Conn. 2009). Under the Social Security Act, however "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts" and "to determine . . . whether [Queiroga] is disabled." *Aponte*, 728 F.2d at 591 (other internal alterations omitted). "Even where the

---

[12] Queiroga assails the ALJ's reference to "repeated falls" as "incongruous[]" because her "point is not that she is disabled due to a proclivity for falling . . . but that looking down caused dizziness and occasional vomiting." Pl.'s Mem. Supp. Mot. Reverse, Doc. No. 17-1, at 10–11. But "the inconsistency between [Queiroga]'s testimony and [her] medical records" clearly was relevant to her "credibility" and "weighed against . . . [her] subjective assessment of the intensity of [her] symptoms." *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order).

administrative record may also adequately support contrary findings on particular issues, the

ALJ's factual findings must be given conclusive effect so long as they are supported by

substantial evidence." *Genier*, 606 F.3d at 49 (internal quotation marks omitted). Because the

ALJ's opinion adequately meets that "very deferential" standard, I affirm the decision below. *See*

*Brault*, 683 F.3d at 448.

## IV.    Conclusion

For the reasons stated, I deny Queiroga's Motion to Reverse, Doc. No. 17, and grant the

Commissioner's Motion to Affirm, Doc. No. 19. The Clerk is directed to enter judgment for the

Commissioner and close the case.


So ordered at Bridgeport, Connecticut, this 28th day of March 2017.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

18